IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | **CRIMINAL ACTION** |
| ) | |
| v. ) | No. 08-10102-01 MLB |
| ) | |
| ERNESTO SAENZ, ) | |
| ) | |
| Defendant. ) | |
| ) | |

**MEMORANDUM AND ORDER**

This case comes before the court on defendant's motion to suppress. (Doc. 11). The motion is fully briefed and the court conducted an evidentiary hearing on August 4, 2008 and August 18, 2008. (Docs. 11, 12, 22). The motion to suppress is DENIED for the reasons herein.

**I. FACTS**[1]

This case arises from a traffic stop that occurred on April 8, 2008 at approximately 8:15 a.m. along the Kansas turnpike near Wellington, Kansas. State Highway Patrol Trooper Roubideaux noticed a Lincoln Blackwood pickup truck traveling northbound along I-35 with an out of state license plate. Roubideaux focused on the Lincoln because it was rare to see this type of expensive truck. Roubideaux checked the license plate to verify the Lincoln was not stolen. Dispatch indicated that the Lincoln had not been reported stolen.

---

[1] The facts consist of testimony by Trooper Roubideaux and Maria Saenz heard at the hearings and as well as the video of the encounter. (Exh. B-1). The court credits the testimony of Roubideaux, the only witness pertaining to the initial stop, detention, and consent to search.

Roubideaux continued driving northbound approximately six or seven car lengths behind the Lincoln. At this time, Roubideaux observed the Lincoln following too closely, within two car lengths, behind a Chevrolet. Roubideaux was concerned for the drivers' safety because at 70 miles per hour it is difficult to stop a vehicle in a short distance. Furthermore, the driver was from out of state and Roubideaux thought that the driver might have been tired or impaired as a result of his long drive. The Lincoln eventually passed the Chevrolet in the passing lane even though the passing lane had been open for quite some time. The Lincoln then moved back into the outside lane and again got within two car lengths of a commercial tractor-trailer. Once again, the inside passing lane was free from traffic, but the Lincoln still waited until it was within two car lengths before passing the tractor-trailer. After observing these two traffic violations over a distance of approximately twelve miles, Roubideaux activated his emergency lights and pulled the Lincoln over.

    Primarily, Roubideaux stopped the Lincoln for driving too close to other vehicles. Roubideaux, however, noticed that the windshield was cracked once he walked closer to the Lincoln. Noting the strong smell of an air freshener, Roubideaux asked defendant and the passenger, defendant's brother, for their driver's licenses and vehicle registration while informing defendant of the reasons for making the stop. Defendant did not have a current driver's license, but produced a Texas photo identification card. Defendant told Roubideaux his driver's license had expired and was unable to renew it before making this emergency trip to see his mother in Minnesota. After being questioned further, however, defendant told Roubideaux

that his driver's license had expired two years earlier.

The registered owner of the Lincoln was Maria Saenz, defendant's wife. Ms. Saenz testified that she together with defendant purchased the Lincoln on January 25, 2006 from a used car lot in Houston, Texas. The Lincoln is titled and registered in Ms. Saenz' name only. Defendant and Ms. Saenz initially asked that both names be put on the title, but defendant's name was excluded because he did not have a current driver's license. Defendant was also excluded from the insurance on the Lincoln. The Lincoln was insured through April 11, 2008, which was paid by Ms. Saenz.

Originally, Ms. Saenz and defendant were making the monthly payments together, but then Ms. Saenz gave her husband responsibility to finance the Lincoln. Ms. Saenz and defendant's relationship was off and on and at times, defendant would not live in the family home. Ms. Saenz and defendant made a formal agreement authorizing defendant to take the Lincoln with him in case they separated permanently because Ms. Saenz could not afford the payments by herself. This contract was notarized and acknowledged on November 4, 2007.

On April 7, 2008, defendant talked with Ms. Saenz about taking the Lincoln to New Mexico to see his mother. Ms. Saenz gave permission to defendant even though he was excluded from the Lincoln's insurance policy. Ms. Saenz testified that she gave permission because defendant was her husband and was making the payments on the Lincoln. Defendant, however, told Roubideaux that he was going to

Minnesota to see his mother.[2]  Defendant indicated that he did not know his mother's address in Minnesota, but his brother had been there before.  Defendant planned on staying in Minnesota for two days, which Roubideaux found odd because two days was a short stay compared to the length of time it takes to travel from Texas to Minnesota.  While defendant was talking, Roubideaux noted that defendant's brother avoided direct eye contact and appeared unusually nervous.

At this point, Roubideaux went back to his patrol car to verify the information defendant provided.  Approximately 3 minutes, 45 seconds passed between Roubideaux's initial encounter to when he radioed dispatch to find out the status of defendant's license.  While waiting for dispatch, Roubideaux called El Paso Intelligence Center to check the criminal history of defendant and his brother.  Defendant's brother had criminal history for narcotics.  Based upon all the circumstances, Roubideaux decided he wanted to search the Lincoln and planned on asking defendant for consent to search.

Dispatch interrupted Roubideaux and was put on hold while he finished talking with El Paso Intelligence Center.  Dispatch informed Roubideaux that defendant's license was revoked.  This occurred about 15 minutes, 35 seconds after the initial stop.  Texas, however, had not entered all the information into the system and as a result, Roubideaux did not know the date and reasons why defendant's license was revoked.  According to Kansas law, a highway trooper may either issue a citation or arrest an individual for driving with a suspended or revoked license.  Thus, before arresting defendant, Roubideaux

---

[2]Roubideaux was not aware that defendant had told Ms. Saenz he was going to New Mexico instead of Minnesota.

wanted to verify if defendant's driver's license was revoked for a minor infraction or a serious crime. Dispatch contacted Texas authorities to determine the reasons for defendant's revoked driver's license, which subsequently took an additional 49 minutes.

In the meantime, Roubideaux asked defendant to come back and sit in his patrol car. Roubideaux wanted to explain to defendant the situation with his driver's license. Defendant agreed and sat in Roubideaux's patrol car for approximately 30 minutes while waiting on dispatch.

Dispatch returned stating that defendant's license had been revoked because of not paying a surcharge for renewal. By this time, approximately one hour had passed since the initial stop. Roubideaux issued defendant a traffic citation and handed defendant back his identification card and registration while defendant exited the patrol car. Defendant opened the patrol car door and stepped out. Before defendant shut the door, Roubideaux asked defendant if he could ask a few more questions. Defendant consented and was subsequently asked if there was marijuana or cocaine in the Lincoln. Defendant responded "No" to both.

Next, Roubideaux asked defendant for consent to search the Lincoln. Defendant consented to the search. Defendant and Roubideaux walked back to the Lincoln and Roubideaux told defendant that as long as he did not find anything, defendant would get out quickly.[3] Roubideaux did not tell defendant he could refuse to consent nor that he could withdraw his consent at any time during the search.

---

[3] In the video, Roubideaux stated, "as long as we don't find anything we'll get you out quickly, ok."

-5-

By this time, two backup patrol cars had arrived, one which contained a K-9 unit. Roubideaux asked defendant's brother to get out of the Lincoln and searched him for weapons. The K-9 walked around the Lincoln and searched inside, but did not alert to any narcotic odors. Roubideaux then searched the Lincoln by hand and found two hard bricks of off white powder behind the rear left bucket seat, which later tested positive for cocaine.

While the Lincoln was being searched, defendant asked if he could use the restroom. Defendant also told Roubideaux that he was diabetic. There were no facilities nearby, so Roubideaux told defendant to go by a line of trees. Roubideaux told another police officer to keep an eye on defendant while he continued searching the Lincoln. Even though defendant was not in physical custody at this time, Roubideaux still wanted to watch defendant for safety purposes. Roubideaux testified that defendant was not being interrogated, but Roubideaux would not have permitted defendant to leave until he finished searching the Lincoln.

Roubideaux arrested defendant and his brother. Roubideax read defendant his <u>Miranda</u> warnings inside his patrol car. Defendant said he understood the warnings and would talk to the police. Even though Roubideaux knew of defendant's medical condition, he did not believe defendant was unable to comprehend the nature of the warnings and the effect of talking with the police. Defendant asked for a cigarette and Roubideaux granted this request, but explained to defendant that it was not in exchange for his cooperation. Additionally, Roubideaux did not make any promises or threats to pressure defendant to answer any questions.

Defendant explained that he previously transported cocaine from Zapata, Texas to Morgan City and delivered the cocaine. The present delivery was coordinated by cell phone. Initially, defendant agreed to provide further assistance with the delivery of the seized narcotics. After further questioning, defendant stated that he was getting tired because he had not slept for a long time and wanted to speak with his brother. Roubideaux let defendant speak with his brother while he remained in the room. Defendant said something in Spanish and Roubideaux told defendant he needed to speak English if he was going to talk with his brother. Defendant's brother then said something in Spanish and defendant thereafter requested an attorney. Roubideaux ceased questioning about the incident, but finished booking defendant.

**II. ANALYSIS**

Defendant asserts that the initial stop was illegal and lasted unreasonably long to conduct a traffic stop. Defendant further claims that the subsequent search of his car was unconstitutional and asks that all evidence seized and statements made resulting from that search be suppressed.

**A. Initial Encounter**

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The Supreme Court has liberally interpreted "seizures" to encompass routine traffic stops, "even though the purpose of the stop is limited and the resulting detention quite brief." See Delaware v. Prouse, 440 U.S. 648, 653 (1979). "Because an ordinary traffic stop is more

analogous to an investigative detention than a custodial arrest," the stops are analyzed under the principles articulated in Terry v. Ohio. United States v. King, No. 05-6399 (10th Cir. Dec. 18, 2006). The two-pronged standard espoused in Terry v. Ohio, 392 U.S. 1 (1968), thus applies, see United States v. Caro, 248 F.3d 1240, 1244 (10th Cir. 2001), and renders a traffic stop reasonable if "the officer's action was justified at its inception, and [if] it was reasonably related in scope to the circumstances which justified the interference in the first place." Terry, 392 U.S. at 20. An initial traffic stop is justified at its inception if it was "based on an observed traffic violation," or if "the officer has a reasonable articulable suspicion that a traffic . . . violation has occurred." United States v. Hunnicutt, 135 F.3d 1345, 1348 (10th Cir. 1998).

The court finds that Roubideaux was justified in stopping defendant's car in the first instance. It is irrelevant that Roubideaux may have had subjective motives for stopping the Lincoln. Hunnicutt, 135 F.3d at 1348. Defendant argues that Roubideaux was six or seven car lengths behind defendant and therefore could not see defendant follow too closely. He further argues that Roubideaux did not testify truthfully regarding the cracked windshield because he could not have seen the crack while following the Lincoln. The court, however, accepts Roubideaux' testimony that he believed defendant committed a traffic infraction when following the Chevrolet and the tractor-trailer too closely. K.S.A. 8-1523(a). Once Roubideaux approached the Lincoln, he noticed that the Lincoln also had a cracked windshield. The initial stop was valid.

**B. Justified Detention**

Even when the initial stop is valid, any investigative detention must not last "longer than is necessary to effectuate the purpose of the stop." Florida v. Royer, 460 U.S. 491, 500 (1983).  An officer "conducting a routine traffic stop may request a driver's license and vehicle registration, run a computer check, and issue a citation." United States v. Bradford, 423 F.3d 1149, 1156 (10th Cir. 2005).

The uncontroverted testimony shows that Roubideaux approached defendant's Lincoln upon initially stopping him for the valid purpose of checking defendant's driver's license and registration.  Defendant was unable to produce a driver's license.  After discovering that defendant was driving without his license, Roubideaux had reasonable suspicion to detain defendant for a traffic violation.  K.S.A. 8-244 states that a driver must have his driver's license in his immediate possession while driving.  Driving without a license is a misdemeanor. Additionally, the Lincoln was registered in defendant wife's name and the expired insurance on the Lincoln specifically excluded defendant. Roubideaux was then justified in requiring defendant to remain until Roubideaux could determine defendant's true identity. Roubideaux returned to his patrol car to verify if defendant's identification card was valid as well as determine the reasons behind defendant's expired driver's license, all of which were appropriate.

It took approximately 15 minutes, 35 seconds to verify that defendant's license had been revoked.  The reasons behind this revocation, however, remained unknown to Roubideaux because Texas authorities had not entered in all of the information into the computer system.  Roubideaux wanted to investigate the reasons for the

revoked license further before deciding whether to arrest defendant or issue a traffic citation.[4]  Specifically, Roubideaux did not want to arrest defendant if his license was revoked for a mere traffic infraction.

After approximately 19 minutes had passed, Roubideaux asked defendant if his license was revoked or expired.  Roubideaux stated the computer was showing the license as revoked.  Defendant told Roubideaux his license expired and he did not renew it.  Roubideaux checked back with dispatch again for an update on defendant's license, but received none.[5]  Roubideaux then asked defendant to come back to his patrol car so he could explain what was going on with his license. While waiting for dispatch to return, Roubideaux asked defendant some additional questions during this time, but this further questioning did not prolong the traffic stop in violation of the Fourth Amendment. United States v. Orduna-Martinez, 491 F. Supp. 2d 1021, 1028 (10th Cir. 2007).  Although Roubideaux could have arrested defendant immediately upon learning that defendant had been driving without a license, which had been revoked, it was not unreasonable for him to continue to detain defendant while investigating the matter further. All of Roubideaux' actions were related to the traffic stop and he was not responsible for the delay in obtaining the information he legitimately sought.

---

[4]After learning of the brother's criminal history, which was approximately 18 minutes after the initial stop, Roubideaux called for backup and told the second trooper he was not sure yet if he would arrest defendant.  The brother's license was valid and he could have legally driven the Lincoln.

[5]Roubideaux called dispatch again about 26 minutes after the initial stop.

-10-

### C. Standing

Fourth Amendment rights are personal in nature. As such, a defendant must have his or her own expectation of privacy unreasonably infringed upon. Rakas v. Illinois, 439 U.S. 128, 133-34, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). "'It is immaterial if evidence sought to be introduced against a defendant was obtained in violation of someone else's Fourth Amendment rights.' [Citations omitted]. Given the personal nature of the interest, standing is a matter of substantive Fourth Amendment law. [Citations omitted]. Standing inquiries thus 'turn[ ] on the classic Fourth Amendment test: whether the individual manifested a subjective expectation of privacy in the area searched and whether society is prepared to recognize that expectation as objectively reasonable.'" United States v. Valdez Hocker, 333 F.3d 1206, 1208-09 (10th Cir. 2003) (quoting United States v. Rascon, 922 F.2d 584, 586 (10th Cir. 1990); United States v. Allen, 235 F.3d 482, 489 (10th Cir. 2000)). The defendant must show that he or she possessed a legitimate interest in or "lawful control over the [vehicle]." Id. at 1209.

In the case at hand, the court finds that defendant met his burden. Defendant presented evidence that he had permission from the Lincoln's registered owner, Ms. Saenz, to possess and drive the Lincoln. Ms. Saenz testified that she gave defendant permission to drive the Lincoln to New Mexico to see his mother. Ms. Saenz also testified that defendant had been making the monthly payments on the Lincoln and that it was their intention from the beginning that Ms. Saenz and defendant jointly own the Lincoln. Therefore, defendant has standing to raise a Fourth Amendment violation stemming from the

-11-

search of the Lincoln. United States v. Rubio-Rivera, 917 F.2d 1271, 1275 (10th Cir. 1990) (finding a reasonable expectation of privacy "[w]here the defendant offers sufficient evidence indicating that he has permission of the owner to use the vehicle.").

   **D. Consent to search**

"[F]urther detention for purposes of questioning unrelated to the initial stop" is generally impermissible. Bradford, 423 F.3d at 1156-57. Nevertheless, "lengthening the detention for further questioning beyond that related to the initial stop is permissible in two circumstances. First, the officer may detain the driver for questioning unrelated to the initial stop if he has an objectively reasonable and articulable suspicion illegal activity has occurred or is occurring. Second, further questioning unrelated to the initial stop is permissible if the initial detention has become a consensual encounter." Hunnicutt, 135 F.3d at 1349. The return of the driver's documents alone does not "transform a detention into a consensual encounter if the totality of the circumstances gives the driver an objectively reasonable basis to believe he is not free to go. [Citations omitted]. Such a reasonable belief may be supported by the presence of more than one officer, the display of a weapon, the physical touching of the detainee, the officer's use of a commanding tone of voice, and the officer's use of intimidating body language. United States v. Chavira, 467 F.3d 1286, 1290-91 (10th Cir. 2006) (citing United States v. Bustillos-Munoz, 235 F.3d 505, 515 (10th Cir. 2000).

   Defendant argues that his consent was not voluntary because sat in Roubideaux' patrol car for approximately 30 minutes just prior to

giving his consent to search, two other police cars were present, and he was not told he could refuse giving consent or withdraw that consent at any time. The Tenth Circuit has held, however, that sitting inside a "patrol car, without more, does not make [defendant's] consent involuntary." Bradford, 423 F.3d at 1158; United States v. Gigley, 213 F.3d 509, 514 (10th Cir. 2000); United States v. Anderson, 114 F.3d 1059, 1064 (10th Cir. 1997) (finding an encounter to be consensual, despite the fact that the officer and the defendant were both sitting in the patrol car during the questioning, because a reasonable person would have felt free to terminate the encounter). Additionally, the fact that there was more than one officer present does not automatically make defendant's consent a product of coercion. See Chavira, 467 F.3d at 1291 (noting that one additional officer's presence was not enough to render the defendant's consent involuntary). Nor did defendant need to be told that he was free to leave, could decline giving consent, or able to withdraw consent at any time. Bradford, 423 F.3d at 1158.

Roubideaux returned defendant's identification card and his brother's driving documents. Defendant opened the door and stepped out Roubideaux' patrol car. It was at that point when Roubideaux instigated additional questioning. Roubideaux first asked defendant if he could ask him some more questions and defendant consented. Roubideaux then asked defendant if he could search the Lincoln and defendant consented again. Both defendant and Roubideaux were standing outside the patrol car before Roubideaux asked for consent to search the Lincoln. Roubideaux did not display his gun or make any threats. Even though other officers were present, defendant does not

suggest that he was intimidated by their presence or even that they were nearby when Roubideaux asked to search the Lincoln. Defendant agreed to let Roubideaux search the Lincoln and the court finds that defendant's consent was voluntary.

### E. Selective Enforcement

Defendant briefly alleges in his motion to suppress that Roubideaux stopped him because he is Hispanic.  "A defendant 'challenging alleged racial discrimination in traffic stops and arrests must present evidence from which a jury could reasonably infer that the law enforcement officials involved were motivated by a discriminatory purpose and their actions had a discriminatory effect.'" United States v. Alcaraz-Arellano, 441 F.3d 1252, 1264 (10th Cir. 2006) (quoting Marshall v. Columbia Lea Reg'l Hosp., 345 F.3d 1157, 1167 (10th Cir. 2003)).

Defendant did not produce any evidence to suggest that Roubideaux was engaged in selective enforcement.  Defendant asked Roubideaux on cross examination if he stopped defendant because he was Hispanic, to which Roubideaux answered "no."  The court finds Roubideaux' answer to be credible.  Plus, there were other legitimate traffic violations to justify Roubideaux stopping defendant.

### III.  CONCLUSION

As a result of the above analysis, the court finds there was no Fourth Amendment violation.  There was a lawful initial stop followed by a reasonable detention and consensual search.  The cocaine found during the search and subsequent statements made by defendant after he was read his Miranda rights are not required to be suppressed as "fruit of the poisonous tree."  See Wong Sun v. United States, 371

U.S. 471, 484 (1963) (requiring exclusion of evidence obtained through an illegal search).

Defendant's motion to suppress is DENIED. The clerk is directed to set this case for trial.

IT IS SO ORDERED.

Dated this  3rd  day of September 2008, at Wichita, Kansas.

                                        s/ Monti Belot
                                        Monti L. Belot
                                        UNITED STATES DISTRICT JUDGE